[No. G037041. Fourth Dist., Div. Three. Feb. 28, 2007.]

LARRY SMALL et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
BRINDERSON CONSTRUCTORS, INC., et al., Real Parties in Interest.

Counsel

Law Offices of Ellyn Moscowitz and Ellyn Moscowitz for Petitioners.

No appearance for Respondent.

Atkinson, Andelson, Loya, Ruud & Romo, Steven D. Atkinson, Thomas W. Kovacich and Christopher S. Andre for Real Party in Interest Brinderson Contractors, Inc.

Bill Lockyer, Attorney General, Randall P. Borcherding and Marguerite C. Stricklin, Deputy Attorneys General, for Real Party in Interest California Industrial Welfare Commission.

Sidley Austin and Jeffrey A. Berman for Employers Group as Amicus Curiae on behalf of Real Parties in Interest.

Opinion

**RYLAARSDAM, Acting P. J.**—Petitioners Larry Small, John Nelson, Kenneth Charles, Glen Cardogan, Theonhilius Thomas, Michael Gittens, and Maurice Briscoe seek extraordinary relief from the trial court's order declaring invalid a wage order promulgated by the California Industrial Welfare Commission (IWC). The wage order regulates the hours, wages, and working conditions of California employees engaged in onsite construction, drilling, logging, and certain mining occupations. The trial court declared the wage order invalid because it was not accompanied by a sufficient statement of the basis, was not properly published, and contained an unworkable definition of "given craft," which made the order unreasonable, arbitrary, capricious, and unfair. We disagree and grant the petition.

## BACKGROUND

In 1999, the Legislature enacted Assembly Bill No. 60 (1999–2000 Reg. Sess.) (Assembly Bill 60) (Stats. 1999, ch. 134), known as the "Eight-Hour-Day Restoration and Workplace Flexibility Act of 1999." (Lab. Code, § 500 et seq; all statutory references are to this code unless otherwise indicated.) Assembly Bill 60 restored the eight-hour workday and mandated overtime pay for all nonexempt employees in all industries for work in excess of eight hours in a workday. It allowed, however, an exception for employees working an alternative work schedule, such as a four 10-hour-day workweek instead of a traditional five 8-hour-day workweek. (§ 510, subd. (a).) An alternative workweek schedule is "deemed adopted only if it receives approval in a secret ballot election by at least two-thirds of affected employees in a work unit." (§ 511, subd. (a).)

Assembly Bill 60 also required the IWC to adopt orders governing wages, hours and working conditions consistent with its terms, including regulations regarding elections to adopt and repeal alternative workweek schedules. (§ 517, subd. (a).) On January 28, 2000, the IWC adopted interim wage order-2000 (Interim Wage Order), which applied to all nonexempt employees in California, including, for the first time, employees in the onsite construction industry and other occupations that would later be covered by wage order No. 16. It became effective March 1, 2000.

Wage Order No. 16-2001 (Wage Order 16) (Cal. Code Regs., tit. 8, § 11160) was adopted on October 23, 2000, and became effective January 1, 2001. It governs employees in construction, drilling, logging, and mining and "supersedes any industry or occupational order for those employees . . . ." (Wage Order 16, 1(F).) Among other things, it requires a new alternative workweek schedule election whenever "the number of employees that are employed for at least 30 days in the work unit that adopted an alternative workweek schedule increases by 50% above the number who voted to ratify the employer proposed alternative workweek schedule . . . ." (Wage Order 16, 3(C)(6).)

Petitioners are construction workers employed by real party in interest, Brinderson Constructors, Inc. (Brinderson). In 2004, petitioners sued Brinderson for unpaid overtime wages allegedly owed for working over eight hours in a day while working an alternative workweek schedule. The basis of the claim is that, although its employees voted in December 1999 to adopt a four 10-hour-day alternative workweek schedule, Brinderson did not conduct further alternative workweek schedule elections after January 1, 2000, when Assembly Bill 60 became effective. Petitioners also sought an extra hour of pay for each day they were not provided with a meal or rest period as required by Wage Order 16, as well as wages for unpaid travel time.

The parties filed cross-motions for determination of the following preliminary legal issue: "assuming a secret ballot election to adopt an alternative workweek schedule was conducted in December 1999, was Brinderson required to conduct one or more additional elections after Assembly Bill 60 became effective on January 1, 2000?" The issue was submitted to the court based on the legislative histories of Assembly Bill 60 and Wage Order 16, the parties' briefs, and the following undisputed facts: "1. On December 29, 1999, Brinderson conducted a secret ballot election to adopt a four ten-hour-day alternative workweek schedule. [¶] 2. The alternative workweek schedule presented for approval at the time of the December 1999 secret ballot election was a four ten-hour-day workweek. [¶] 3. In January 2000, Brinderson filed with the Department of Industrial Relations ('DIR') the results of the December 1999 secret ballot election. [¶] 4. Between January 1, 2000, and the date [petitioners] filed the above-captioned lawsuit, Brinderson did not conduct additional secret ballot elections. [¶] 5. [Petitioners] were not employed by Brinderson when Brinderson conducted the secret ballot election in December 1999. [¶] 6. [Petitioners were] employed at various times by Brinderson as construction workers . . . . [¶] 7. During their employment at Brinderson, each of the [petitioners] worked an alternative workweek schedule based on a four ten-hour-day workweek. [¶] 8. After the secret ballot election was conducted in December 1999, at least one 'work unit['] increased in size by more than 50%.[] [¶] 9. Brinderson was not a party to any collective bargaining agreement with any labor union at any relevant time before February 1, 2005." (Fn. omitted.)

After a hearing on the cross-motions, the court issued its written ruling. It concluded Brinderson had properly adopted an alternative workweek schedule in December 1999, and that Wage Order 16 did not invalidate the alternative workweek schedule or require another election because: (1) "Wage Order 16 was not accompanied by the required adequate statement of the basis"; (2) "Wage Order 16 was not properly published"; and (3) Wage Order 16 is "unreasonable, arbitrary, capricious, and unfair" because it contains an unworkable definition of "given craft." Petitioners filed a motion for reconsideration in which they presented evidence of publication. The court sustained Brinderson's lack of foundation, failure to authenticate, and hearsay objections and denied the motion. The Attorney General's request to participate as amicus curiae was also denied.

Petitioners now ask this court issue a writ of mandate compelling the trial court to vacate its minute order. We granted the Attorney General permission to intervene on behalf of the IWC and the application of Employers Group to file an amicus curiae brief in support of Brinderson.

## DISCUSSION

### 1. *Failure to Provide Necessary Documents or Citations to the Record*

We first address Brinderson's contention that we may summarily deny the petition because petitioners failed to provide an adequate record. Rule 8.490(c) of the California Rules of Court (formerly rule 56(c); all rule references are to these rules) provided that a writ petition "that seeks review of a trial court ruling must be accompanied by an adequate record." Required to be included were "documents or portions of documents submitted to the trial court that are necessary for a complete understanding of the case and the ruling under review; and [¶] . . . [a] reporter's transcript of the oral proceedings that resulted in the ruling under review." (Rule 8.490(c)(1)(C), (D).) If the transcript is unavailable, counsel must provide a declaration explaining why and "fairly summarizing the proceedings, including counsel's arguments and any statement by the court supporting its ruling; or [¶] . . . [s]tating that the transcript has been ordered, the date it was ordered, and the date it is expected to be filed . . . ." (Rule 8.490(c)(2)(A), (B).) If the petitioner does not do so, "the court may summarily deny . . . the petition[.]" (Rule 8.490(c)(5).)

Brinderson asserts the record does not contain a copy of the "[s]tipulation identifying the briefs the parties would file and the dates those briefs would be filed" and that "[t]he documents comprising the administrative record of Wage Order 16 are not in the order they appeared in when submitted to the trial court, and some of the pages are either missing or out of place." (Underscoring omitted.) But Brinderson fails to explain how any of this would affect our "complete understanding of the case and the ruling under review[.]" (Rule 8.490(c)(1)(C).) Assertions unsupported by reasoned argument are treated as waived. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 [79 Cal.Rptr.2d 273].)

On the other hand, Brinderson correctly notes that petitioners failed to provide a copy of the reporter's transcript of the hearing that resulted in the ruling under review. Petitioners also failed to provide the requisite declaration explaining the reason for the transcript's unavailability and summarizing the proceedings.

In their reply brief, petitioners admit they did not provide the transcript, but assert that was "because no one ever requested a transcript of that hearing be prepared. To [their] knowledge, there is no such transcript! [Brinderson] did not attach it with [its] brief, nor do[es it] argue there was anything of value in that transcript that would or could change the outcome of what this Court might decide or consider. Nothing in [Brinderson's] brief is referenced

to that hearing, and Judge Bauer's decision of that hearing is fully explained in his March 9th Order." (Underscoring and capitalization omitted.) This ignores the fact that, as the petitioners seeking relief, it was they, not the real party in interest, who had the obligation to obtain and submit the transcript, regardless of any written ruling by the court.

Brinderson also correctly points out that, except for minimal citations on four pages of the memorandum of points and authorities in support of the petition, petitioners fail to support any of their factual assertions with citations to the record, as required by rule 8.204 (formerly rule 14). (Rules 8.204(a)(1)(C), 8.490(a)(1); see also *Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856 [85 Cal.Rptr.2d 521] [failure to support argument with citation to record warrants waiver of issue].)

Although petitioners' noncompliance with appellate rules would justify a summary denial or the striking of portions of their writ petition, we will not do either. Instead, because of the importance of this decision, not only to petitioners but also to many others, we shall exercise our discretion to decide the petition on the merits. (See *Richmond Redevelopment Agency v. Western Title Guaranty Co.* (1975) 48 Cal.App.3d 343, 347 [122 Cal.Rptr. 434].)

## 2. *Wage Order 16*

■ Petitioners contend the trial court erred in concluding Wage Order 16 lacked the required adequate statement as to the basis, was not properly published, and was "unreasonable, arbitrary, capricious, and unfair." We agree.

### a. *Standard of Review*

Because the IWC "exercise[s] a legislative function in promulgating [its orders], [t]he courts exercise [a] limited review . . . ." (*California Hotel & Motel Assn. v. Industrial Welfare Com.* (1979) 25 Cal.3d 200, 212 [157 Cal.Rptr. 840, 599 P.2d 31], fn. omitted (*California Hotel*).) But "[a]lthough administrative actions enjoy a presumption of regularity, this presumption does not immunize agency action from effective judicial review. A reviewing court will ask three questions: first, did the agency act within the scope of its delegated authority; second, did the agency employ fair procedures; and third, was the agency action reasonable. . . . A court will uphold the agency action unless the action is arbitrary, capricious, or lacking in evidentiary support. A court must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute. An order fixing the

wages, hours, and conditions of employment therefore may not be arbitrary or capricious, the order must include an adequate statement of basis, and the order and statement must be reasonably supported by the evidence." (*Ibid.*, fns. omitted.) In sum, our " ' "review is limited to an examination of the proceedings to determine whether the action is arbitrary or entirely lacking in evidentiary support or whether the agency has violated the procedure required by law . . . ." ' " (*California Labor Federation v. Industrial Welfare Com.* (1998) 63 Cal.App.4th 982, 989 [74 Cal.Rptr.2d 397] (*California Labor Federation*).)

### b. *Compliance with Section 517, Subdivision (a)*

Before turning to the grounds the trial court relied on, we first address Brinderson's contention the IWC failed to comply with the Legislature's directives in section 517, subdivision (a), rendering Wage Order 16 invalid. The court did not specifically address this issue, although Brinderson raised it.

Section 517, subdivision (a) provides that the IWC "shall, at a public hearing to be concluded by July 1, 2000, adopt wage, hours, and working conditions orders consistent with [Assembly Bill 60] without convening wage boards, which orders shall be final and conclusive for all purposes." According to Brinderson, Wage Order 16 is invalid because (1) its statement as to the basis reveals the IWC received a report from, and considered the recommendations of, a wage board in violation of the Legislature's directive; and (2) it was not adopted until October 23, 2000, over three months after the July 1 deadline set forth in the statute. Therefore, Brinderson argues, the IWC did not act within the scope of its delegated authority. (*California Hotel, supra,* 25 Cal.3d at p. 212.) We disagree.

The promulgation of the Interim Wage Order satisfied section 517, subdivision (a)'s mandate. Beginning in 1999, the IWC held public hearings regarding the requirements of Assembly Bill 60 and promulgated the Interim Wage Order on January 28, 2000. This was done well before the deadline set forth in section 517, subdivision (a) and without convening wage boards. The Interim Wage Order declared certain wage orders null and void and reinstated others, as modified in the Interim Wage Order, until the IWC could promulgate amended or new orders pursuant to section 517. But it expressly covered "[a]ny industry or occupation not previously covered by . . . the Commission's Wage Orders in effect in 1997." For these, including employees in the onsite occupations, the Interim Wage Order applied the requirements of Assembly Bill 60 "final[ly] and conclusive[ly] for all purposes" as mandated by section 517, subdivision (a).

▇ The IWC's subsequent actions were also within its delegated authority. Section 517, subdivision (e) states, "Nothing in this section is intended to restrict the Industrial Welfare Commission in its continuing duties pursuant to Section 1173." Section 1173 imposes on the IWC a continuing duty "to ascertain the wages paid to all employees in this state, to ascertain the hours and conditions of labor and employment in the various occupations, trades, and industries in which employees are employed in this state, and to investigate the health, safety, and welfare of those employees." Upon investigation, if the IWC finds the wages paid inadequate or that "the hours or conditions of labor may be prejudicial to the health, morals, or welfare of employees," section 1178 requires it to convene a wage board. Under section 1182, after receiving the wage board's report and conducting public hearings on the proposed regulations, the IWC "may, upon its own motion, amend or rescind an existing order or promulgate a new order. However, with respect to proposed regulations based on recommendations supported by at least two-thirds of the members of the wage board, the commission shall adopt such proposed regulations, unless it finds there is no substantial evidence to support such recommendations." (§ 1182, subd. (a).)

The Interim Wage Order was limited to Assembly Bill 60's requirements and did not include certain regulations found in other wage orders. To "determine whether a separate and more comprehensive wage order should be promulgated for construction [and other onsite industries], and at the request of both employer and employee representatives, the IWC . . . voted on January 28, 2000 to convene a wage board" in accordance with sections 1173, 1178, and 1178.5. After receiving the wage board's report, the IWC held additional public hearings in September and October 2000 on the proposed regulations for the new wage order, which included many sections found in other existing wage orders. In October 2000, the IWC adopted Wage Order 16, which became effective on January 1, 2001. As required by section 1182, subdivision (a), the new order included proposed regulations recommended by two-thirds of the members of the wage board.

Brinderson contends "[n]either convening a wage board nor adopting a wage order are among the continuing duties the IWC must perform" under section 1173. True, but ascertaining the conditions of labor and investigating the health, safety, and welfare of employees are. And in convening a wage board, the IWC was determining whether the interests of employees in onsite occupations required a separate wage order.

Brinderson also claims the IWC acted outside the scope of its authority under the second paragraph of section 1173. That paragraph states, "The commission shall conduct a full review of the adequacy of the minimum wage at least once every two years. The commission may, upon its own

motion or upon petition, amend or rescind any order or portion of any order or adopt an order covering any occupation, trade, or industry not covered by an existing order pursuant to this chapter." According to Brinderson, the IWC did not "amend or rescind any order or any portion of any order," but rather adopted a new wage order covering occupations that were already covered by the Interim Wage Order. The contention lacks merit.

Because Wage Order 16 was adopted after the IWC received the wage board report and held public hearings, it was promulgated pursuant to section 1182; we offer no opinion on whether it may have been adopted under section 1173 as well. Section 1182 authorizes the IWC to "amend or rescind an existing order or promulgate a new order" (§ 1182, subd. (a)) without section 1173's requirement that the new order apply to an "occupation, trade, or industry not covered by an existing order . . . ." (§ 1173.) Wage Order 16 expressly states that it "supersedes any industry or occupational order for those employees employed in occupations covered by this order." (Wage Order 16, 1(F).) In adopting this language, the IWC both effectively re-scinded the Interim Wage Order as applied to the onsite occupations of construction, drilling, logging and mining, and promulgated a new order covering them.

We reject Brinderson's contention that section "1182 was not a valid basis for the IWC's action because [section 517, subdivision (a)] specifically directed the IWC not [to] use the wage board procedure . . . ." As explained above, the Interim Wage Order applied the requirements of Assembly Bill 60 "final[ly] and conclusive[ly] for all purposes" as required by section 517, subdivision (a). Once that was done, nothing in that section precluded the IWC from subsequently convening a wage board.

c. *Statement as to the Basis*

■ Section 1177, subdivision (b) requires the IWC to "prepare a state-ment as to the basis upon which an adopted or amended order is predicated." In compliance, the IWC prepared a 14-page statement as to the basis for Wage Order 16. Petitioners and the IWC contend the court erred in finding the statement of basis inadequate. We agree.

"A statement of basis . . . need only provide 'an explanation of how and why the [IWC] did what it did.' [Citations.]" (*California Labor Federation, supra*, 63 Cal.App.4th at p. 997.) It "need not be a totally exhaustive document, and 'is not the equivalent of the findings of fact that a court may be required to make.' [Citation.]" (*Ibid.*) "[T]he IWC [is] not required to make findings of fact on subsidiary, tangentially related issues or alternative suggestions . . . ." (*Ibid.*)

To be effective, the statement "should reflect the factual, legal, and policy foundations for the action taken. The statement of basis must show that the order adopted is reasonably supported by the material gathered by or presented to the commission—through its own investigations, the wage board proceedings, and the public hearings—and is reasonably related to the purposes of the enabling statute." (*California Hotel, supra,* 25 Cal.3d at p. 213, fn. omitted.) "If terms of the order turn on factual issues, the statement must demonstrate reasonable support in the administrative record for the factual determinations. If, on the other hand, the terms of the order turn on policy choices, an assessment of risks or alternatives, or predictions of economic or social consequences, the statement of basis must show how the commission resolved conflicting interests and how that resolution led to the order chosen. If an order differentiates among classes of industries, employers, or employees, the statement of basis must show that the distinctions drawn are reasonably supported by the administrative record and are reasonably related to the purposes of the enabling statute." (*Id.* at p. 214.)

Applying this standard, *California Hotel* held that a one-paragraph statement of basis, which simply recited the IWC's authority and the procedures outlined in sections 1171 through 1204, was insufficient because it did "not fulfill any of the functions of an effective statement outlined above." (*California Hotel, supra,* 25 Cal.3d at p. 214.) But in a subsequent case, the Supreme Court warned against reading "into section 1177 unreasonably burdensome requirements that are basically incompatible with the commission's quasi-legislative task." (*Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 710 [166 Cal.Rptr. 331, 613 P.2d 579] (*Industrial Welfare Com.*).) The "legislative purpose of effectively informing employers and employees of the basic reasons for the commission's actions would be defeated if we were to interpret the statute to require a statement so lengthy and detailed that, in practice, such statement would have to [be] printed in extremely small type or in a document so extended that no one could reasonably be expected to read it." (*Id.* at p. 714.)

Here, the lengthy statement as to the basis for Wage Order 16 deals directly with, and provides explanations for, the various provisions of the order; refers to specific comments and recommendations raised in the administrative proceedings; explains why the IWC decided to adopt some proposals but reject others; and gives reasons for imposing a different regulation on some industries and exempting other occupations from certain requirements. (See *Industrial Welfare Com., supra,* 27 Cal.3d at p. 712.) Such a statement "leaves little doubt that the commission has made a thorough and conscientious effort to explain 'how and why [it] did what it did.' [Citation.]" (*Ibid.*; see also *California Labor Federation, supra,* 63 Cal.App.4th at p. 996 [statement of basis sufficient where it "exhaustively covers the relevant facts,

details the process of investigation and public hearings which led the IWC to take the action in question, and explains the IWC's reasoning"].)

Brinderson maintains the statement was deficient as to the definition of "work unit," the requirement that a new election be conducted whenever the number of employees in a "work unit" increases by 50 percent, and the 30-day waiting period before employees affected by the adoption of a new alternative workweek schedule may be required to work the new schedule. We address each of these in turn.

### (1) Work Unit

Wage Order 16 defines "work unit" as "all nonexempt employees of a single employer within a given craft who share a common work site. A work unit may consist of an individual employee as long as the criteria for an identifiable work unit in this subsection are met." (Wage Order 16, 2(U).) The statement of basis for this definition provides, "Pursuant to a two-thirds (2/3) vote of the wage board, the IWC included additional definitions for 'Work Unit[,]' which means all nonexempt employees of a single employer within a given craft who share a common work site, and may consist of an individual employee as long as the criteria for an identifiable work unit in this subsection is met . . . ."

Brinderson argues this statement fails to explain the " 'factual, legal, and policy foundations' " or " 'show how the commission resolved conflicting interests and how that resolution led to the order chosen.' " We disagree. Because the definition was included based on the recommendation of two-thirds of the members of the wage board, section 1182, subdivision (a) required the IWC to adopt the definition unless it found no substantial evidence in the record to support the recommendation. By adopting the definition, the IWC implicitly found substantial evidence existed. Thus, the phrase "[p]ursuant to a two-thirds (2/3) vote of the wage board" in the statement of basis reveals "how and why the [IWC] did what it did" (*California Hotel, supra,* 25 Cal.3d at 213, fn. omitted; see *Industrial Welfare Com., supra,* 27 Cal.3d at p. 711), which is all the Supreme Court and section 1177 demand.

### (2) New Election Requirement

Wage Order 16 requires that, "[i]f the number of employees who are employed for at least 30 days in the work unit that adopted an alternative workweek schedule increases by 50 percent above the number who voted to ratify the employer-proposed alternative workweek schedule, the employer must conduct a new ratification election pursuant to the rules contained in

subsection (C)." (Wage Order 16, 3(C)(6).) Brinderson argues the statement of basis for this regulation does not identify the policy foundations underlying the requirement for a new election whenever the number of employees in a "work unit that adopted an alternative workweek schedule increases by 50 percent above the number who voted to ratify the employer-proposed alternative workweek schedule." Its reading of the statement of basis is too narrow.

Brinderson cites only a portion of a paragraph as constituting the complete statement of basis. The entire paragraph, including the part Brinderson omitted, states: "The requirements that an election to repeal an alternative workweek agreement must be held within thirty (30) days of an employee petition and on the affected employees' work site fall under the IWC's Labor Code § 517 authority. The prerequisite of a six (6) month lapse after the adoption of an alternative workweek schedule before an election to repeal can be held is similar to preexisting language found in Wage Orders 1 though 13 requiring a (12) month lapse after the adoption of a[n] alternative workweek schedule. However, employees and employers in the construction industry testified that crews at work sites can change often and that a work unit could have a 50% or more change in employees in a much shorter time period. In response to this information, the IWC reduced the time period and included a provision that if the number of employees that are employed for at least 30 days in the work unit that adopted an alternative workweek schedule increases by 50% above the number who voted to ratify the employer proposed alternative workweek schedule, the employer must conduct a new ratification election pursuant to the election procedures contained in this section."

This paragraph, in conjunction with statements contained in the alternative workweek schedule and election procedure sections, as well as the statutes cited, fully explores the IWC's reasoning in adopting the regulation. Together, they reaffirm the state's commitment to the eight-hour workday standard and daily overtime, and emphasize that the decisions whether to adopt or repeal a regularly scheduled alternative workweek lies with the employees. Both the decision to adopt and the decision to repeal an alternative workweek schedule require a two-thirds vote of the affected employees. (Wage Order 16, 3(C)(1), (5).) When the number of employees in a work unit increases by 50 percent, those who originally voted for an alternate workweek schedule may no longer represent the vote of two-thirds of the employees. Employees covered under other wage orders must wait six months after an alternative workweek schedule is adopted before an election to repeal can be held. But because crews at construction work sites can change often and may increase by at least 50 percent in a much shorter time, the IWC reduced the time before such election may be held to allow the new employees a voice in deciding whether to work the alternative workweek schedule without having to wait six months.

■ Brinderson maintains that the fact " 'crews at worksites can change often' " "would just as easily support a wage order that does not require a new election every time the number of employees in a 'Work Unit' . . . increases by 50% above the number of employees who voted to adopt an [alternative workweek schedule] in order to promote stability and predictability." According to Brinderson, the statement of basis is deficient because it does not explain how the IWC resolved conflicting interests. The Supreme Court, however, has held it unnecessary for the IWC to "not only explain why it adopted the orders that it did, but also detail its reason[s] for not adopting the myriad of possible alternatives to its regulations." (*Industrial Welfare Com.*, *supra*, 27 Cal.3d at p. 714.) "Such an interpretation of section 1177 . . . would be totally impractical and would impose an unreasonable burden upon the agency." (*Ibid.*)

### (3)  30-day Waiting Period

Wage Order 16 declares, "Employees affected by a change in work hours resulting from the adoption of an alternative workweek schedule shall not be required to work those new work hours for at least 30 days after the announcement of the final results of the election." (Wage Order 16, 3(B)(1)(e).) The IWC had included this language in wage orders prior to Wage Order 16. (Compare subd. 3(C)(7) of Cal. Code Regs., tit. 8, §§ 11010, 11020, 11030, 11040, 11050, 11060, 11070, 11080, 11090, 11100, 11110, 11120 & 11030 with Wage Order 16.) No explanation is necessary when the IWC "is simply continuing in effect a regulation that has previously become a part of the standard working conditions of 'employees in the modern society.' [Citation.]" (*Industrial Welfare Com.*, *supra*, 27 Cal.3d at p. 715.)

### d.  Publication

The court concluded Wage Order 16 was invalid in part because petitioners had failed to dispute Brinderson's contention the record contained no evidence the order was published, as required by section 1182.1. Petitioners and the IWC argue this was error. We agree.

The parties had asked the court to determine the preliminary legal issue of whether, "assuming a secret ballot election to adopt an alternative work schedule was conducted in December 1999, . . . Brinderson [was] required to conduct one or more additional elections after Assembly Bill 60 became effective on January 1, 2000." They submitted the issue to the court based on nine undisputed facts. Publication was not within the scope of the issue submitted, nor was it raised by any of the undisputed facts.

■ Even if it was, section 1182.1 imposed an official duty on the IWC to publish the order in certain specified cities. "It is presumed that official duty

has been regularly performed," absent any proof to the contrary. (Evid. Code, § 664; see *Mann v. Tracy* (1921) 185 Cal. 272, 277–278 [196 P. 484] [where charter requires printing for distribution, duty presumed performed]; *Roelfsema v. Department of Motor Vehicles* (1995) 41 Cal.App.4th 871, 879 [48 Cal.Rptr.2d 817] [sobriety checkpoint presumed to have been regularly performed as official duty absent evidence of irregularity].)

Brinderson argues "[t]he absence of a business record can be offered as evidence to prove the nonoccurrence of an act or an event." (See Evid. Code, § 1272; see also *Godshalk v. City of San Diego* (1971) 16 Cal.App.3d 459, 469 [94 Cal.Rptr. 42] ["presumption that official duty has been regularly performed cannot serve to supplement an official record seemingly complete on its face and which indicates the questioned duty has not been performed, for the reason that the same presumption would apply to the correctness of the record"].) But Brinderson did not present the IWC's business records. As the IWC points out, "[t]he administrative record that the parties submitted to the trial court was obtained from a legislative service and not the IWC." Brinderson thus failed to carry its burden of proof to show the IWC did not perform its official duty to publish the order.

We deny the IWC's request for judicial notice of two pages of a November 2000 issue of The Business Journal as being unnecessary to our determination. In light of our conclusion, we need not address whether the court abused its discretion in denying petitioners' motion for reconsideration.

e. *Unreasonable, Arbitrary, Capricious, and Unfair*

Petitioners and the IWC argue the court abused its discretion in determining Wage Order 16 was unreasonable, arbitrary, capricious and unfair. The contention has merit.

In making that determination, the court reasoned, "The promulgated definition of 'work unit' is flawed. Most telling here may be the inability of these parties to agree upon what constitutes a 'given craft' within the definition of 'work unit.' The [petitioners] have suggested that 'craft' equals 'construction workers.' They were perhaps impelled to do so by the quite reasonable notion that such an implausible definition was necessary in order to save this wage order. However, their interpretation is just a short step from defining 'craft' as 'employee' or 'working person;' it ignores the modifier 'given' (which strongly suggests that each 'craft' is unique and particular); and it is at odds with the common understanding about the construction trades. [¶] . . . With numerous crafts working at a construction project and the requirement for frequent new elections and the required fourteen-day notice of any election

and the thirty-day waiting period for implementation of an alternative work-week, such a plan would effectively be beyond the reach of any employer who did not have union blessing therefor." '

As explained above, however, the definition of work unit was adopted by the IWC by a two-thirds vote of the wage board. Section 1182, subdivision (a) requires the IWC to adopt regulations "supported by at least two-thirds of the members of the wage board" "unless it finds . . . no substantial evidence to support such recommendations." The IWC did not find a lack of substantial evidence, as evidenced by its adoption of the definition recommended by the wage board. Once it found no absence of substantial evidence, the IWC had no discretion to disregard the wage board's recommendation. Because the definition adopted was based on the recommendation of at least two-thirds of the members of the wage board, which was comprised of representatives of both employers and employees (§ 1178.5), and was implicitly supported by substantial evidence, it was not arbitrary and capricious.

As for the court's ruling the definition was unreasonable and unfair, such policy determinations were matters for the wage board whose recommendation, where supported by at least two-thirds of its members, the IWC was obligated to follow. Courts "should not engage in needless policy determinations regarding wage orders the IWC promulgates. '[R]eview of the [IWC]'s wage orders is properly circumscribed. . . . "A reviewing court does not superimpose its own policy judgment upon a quasi-legislative agency in the absence of an arbitrary decision . . . ." ' [Citation.]" (*Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 587 [94 Cal.Rptr.2d 3, 995 P.2d 139].)

### f. *Waiver*

As a final matter, we reject Brinderson's assertion that petitioners and interveners failed to address, and therefore waived any challenge to, the court's finding "that Brinderson's analysis of . . . section 511 is logical and leads to the conclusion that its 1999 work plan was valid and has not been invalidated by any subsequent enactment." This finding was dependent on the court's other determinations, which we have already discussed above.

## DISPOSITION

The petition is granted. Let a writ of mandate issue directing the superior court to vacate its March 9, 2006 order ruling Wage Order 16 invalid and to issue a new and different order ruling (1) the statement as to the basis for Wage Order 16 is valid with regard to the items challenged; (2) whether Wage Order 16 was properly published was not within the scope of the preliminary legal issue submitted by stipulation to the court to determine, and

in any event there is a presumption the IWC complied with its official duty to publish the order in the specified cities; and (3) Wage Order 16 was not unreasonable, arbitrary, capricious or unfair with respect to the definitions of "work unit" and "given craft." The superior court is further directed to make findings consistent with this opinion on the preliminary legal issue submitted by the parties of whether, "assuming a secret ballot election to adopt an alternative work schedule was conducted in December 1999, . . . Brinderson [was] required to conduct one or more additional elections after Assembly Bill 60 became effective on January 1, 2000." Petitioners shall recover their costs in this writ proceeding.

Aronson, J., and Ikola, J., concurred.

The petition of real party in interest Brinderson Contractors, Inc., for review by the Supreme Court was denied May 16, 2007, S151779.