**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROBERT BURNSIDE; FRANCISCO
GOMEZ; RAY ARNETT, Individually,
on behalf of themselves and all
others similarly situated; CHARLES
LINGENFELTER; RON CRUES;
CHARLES R. WILLIAMS,
Individually, on behalf of
themselves and all others similarly
situated,
                    *Plaintiffs-Appellants,*

                    v.

KIEWIT PACIFIC CORPORATION, a
Delaware Corporation; DOES, 1
through 100 inclusive.
                    *Defendants-Appellees.*

No. 04-57134

D.C. No.
CV-04-01745-MLH

OPINION

Appeal from the United States District Court
for the Southern District of California
Marilyn L. Huff, District Judge, Presiding

Argued February 16, 2007
Submitted June 20, 2007
Pasadena, California

Filed June 20, 2007

Before: Harry Pregerson, William A. Fletcher, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

## COUNSEL

George F. Schaefer, Law Offices of George F. Schaefer, San Diego, California, for the plaintiffs-appellants.

Thomas R. Kaufman, Seyfarth Shaw LLP, Los Angeles, California, for the defendant-appellee.

## OPINION

BERZON, Circuit Judge:

The named plaintiffs in this case (whom we will call "Burnside," for the first named plaintiff) represent approximately 270 former and current employees of defendant Kiewit Pacific Corporation ("Kiewit"). Burnside alleges that Kiewit never compensated the employees for time they spent traveling from designated meeting sites to their jobsites and from those jobsites back to the designated meeting sites. Kiewit, Burnside further alleges, required them to undertake this round trip daily; they were not allowed to get to the jobsites on their own. This appeal requires us to decide a single question: Whether the employees' claims, brought under state law, are preempted by section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a). We hold that they are not, reverse the district court's decision to the contrary, and remand with instructions to remand to the Superior Court of San Diego County.

## I

### A

Robert Burnside, Francisco Gomez, Ray Arnett, Charles Lingenfelter, Ron Crues, and Charles Williams, along with approximately 265 additional members of a putative class, are all current and former Kiewit employees. Over a four-year period that began around October 2000[1] these employees worked to install duct and fiber optic lines on two Kiewit

---

[1]The employees were hired on various dates beginning in October 2000 and continuing through January 2001.

projects: (1) the Santee-Yuma Project, linking Santee, California to Yuma, Arizona; and (2) the Victorville-Prim Project, linking Victorville, California, to Prim, Nevada.

According to the complaint, Kiewit prohibited its employees from reporting directly to their daily jobsites. Instead, the employees working on the Santee-Yuma Project were required to meet at a designated site in either Alpine, California or El Centro, California; employees working on the Victorville-Prim Project were required to meet at a Barstow, California site. At these designated meeting sites Kiewit's managers instructed the employees "on the day's tasks" and had them "retrieve equipment and plans for use on the Fiber Optic Projects." Once these initial meetings concluded, the employees traveled in company vans or pickup trucks, frequently operated by the employees themselves, to their jobsites. At the end of the work day, employees re-boarded these vans and trucks to return to the original meeting sites. The complaint alleges that Kiewit managers told employees working on the Santee-Yuma Project that the reason for this arrangement was "a shortage of parking spaces" at the jobsite.[2]

Burnside estimates that the combined meeting and travel time added two to two-and-one-half hours of work to each employee's day. Burnside also represents that each employee already worked more than eight hours every day and more than forty hours every week, so the meeting and travel time constituted overtime; as a result, Burnside maintains, Kiewit must pay the employees the overtime wage rate for those

_____

[2]Burnside supported the allegations made in the complaint with declarations from two named plaintiffs, Gomez and Crues, both of whom worked on the Santee-Yuma Project. In their declarations, both stated that Kiewit required its employees to arrive at the meeting sites and drive from there, in company vans or trucks, to the jobsites; that no free or employer-paid parking was provided at the jobsites; and that with the exception of one crew, no Kiewit employee was ever compensated for this meeting and travel time.

hours. In total, Burnside "conservatively estimate[s]" that Kiewit owes the employees more than $16 million in wages.

**B**

At all times relevant to this litigation, many of the terms and conditions of each employee's work for Kiewit were governed by one of five collective bargaining agreements ("CBAs"). Because these CBAs will feature prominently in our subsequent analysis, we describe them here. We first identify the CBAs, and for ease of reference, assign each a number:

Agreement 1: Associated General Contractors of America, San Diego Chapter, Inc. & International Union of Operating Engineers, Local Union No. 12

Agreement 2: Associated General Contractors of America, San Diego Chapter, Inc. & Laborers' International Union of North America, Local No. 89

Agreement 3: Associated General Contractors of America, San Diego Chapter, Inc. & Building Material, Construction, Industrial, Professional and Technical Teamsters Union, Local No. 36

Agreement 4: Associated General Contractors of California, Inc. & International Union of Operating Engineers, Local Union No. 12

Agreement 5: Southern California General Contractors & The Southern California District Council of Laborers

Each CBA is fairly extensive, covering, among other things, the length of a typical shift, holidays and vacation time, and the payment of overtime wages. For our purposes, we focus on those terms and conditions related to transportation and parking, two topics that are addressed differently in different CBAs:

Three of the five CBAs — Agreements 1, 4, and 5 — use the following language, which we take directly from Agreement 1, or a slight variant thereof:

> 4. Employees shall travel to and from their daily initial reporting place on their own time and by means of their own transportation.[3] *The Contractor shall be responsible for payment of wages from the reporting point (parking area), as ordered by the Contractor to the jobsite and from job-to-job and return. However, employees who voluntarily report to a point for free transportation to the jobsite will not be compensated for the time in route and return.* . . .

> 5. Whenever, because of remoteness of parking areas, hazardous road conditions or security restrictions, the Contractor is required to furnish transportation for workmen within his jobsite to the place of their work, this transportation shall be equipped with seats and handrails.[4]

---

[3]At this point in the CBA, Agreement 4 includes one additional, related sentence: "Whenever free parking is not available on or within 350 yards of a jobsite, the contractor shall be responsible for designating a free parking area for his employees." A substantially similar sentence appears elsewhere in Agreement 1, *see note* 4 *infra*, and Agreement 5, *see* note 5 *infra*.

[4]Agreement 1 also includes the following language, not included in Agreements 4 and 5:

> 6. The Contractor shall provide or pay for parking facilities for employees where a sufficient quantity of available free parking is not available within three (3) blocks of the job. This shall apply to all jobs or projects when work is being performed by Operating Engineers within the entire jurisdiction of Local No. 12.

(Emphasis added.) In other words, although Agreements 1, 4, and 5 first establish that each employee is responsible for his own transportation to a "daily initial reporting place," they also make clear that the "Contractor" is "responsible for payment of wages" for round-trip commutes from "the reporting point . . . to the jobsite," unless the employee has reported to that initial meeting point "voluntarily."

The other two CBAs — Agreements 2 and 3 — include only the following language regarding transportation and parking:

> *Employees shall travel to and from work on their own time and by means of their own transportation.*
> . . .
>
> In the event free parking facilities are not available within three hundred and fifty (350) yards of a jobsite, the Employer will provide such facilities and shall have the right to designate parking areas to be used. Where, because of congested parking conditions, it is necessary to use public facilities, the Employer shall reimburse the employee for the cost of such parking upon being presented with a receipt or voucher certifying to the cost thereof, such reimbursement to be made on a weekly basis or at the conclusion of the project, whichever occurs earlier.[5]

---

[5]Agreement 2 also includes the following language, not included in Agreement 3: "The Employer shall not be responsible for toll expenses." Agreement 3 contains the following sentence, not included in Agreement 2: "No employee shall be required to furnish to the employer transportation of the employer's tools, materials, or equipment of any kind." The second paragraph here ("In the event free parking facilities . . . whichever occurs earlier.") appears in its entirety in Agreements 4 and 5, although not in Agreement 1. Finally, Agreements 2, 3, 4, and 5 also include the following sentence at the end of that paragraph: "Designated parking areas shall be reasonably level and graded to drain."

(Emphasis added.) Thus, unlike Agreements 1, 4, and 5, Agreements 2 and 3 are silent regarding the existence of a "daily initial reporting place," separate and apart from the job-site, and so do not address whether the employer would be responsible for compensating his employees for any time spent traveling between these two points.

## C

Burnside made no mention of these CBAs in the complaint filed against Kiewit. Instead, the complaint set forth three claims, all based on state law. Specifically, the employees alleged: (1) violations of California's Business & Professions Code §§ 17200 *et seq.*, on the theory that non-payment of wages, overtime, and employment taxes and benefits gave Kiewit an unfair competitive advantage, *see* CAL. BUS. & PROF. CODE §§ 17200 *et seq.*; (2) violations of California Industrial Welfare Commission Wage Order 16-2001, and sections 200, 500, 510, 1194, and 1198 of the California Labor Code, for unpaid regular and overtime wages, *see* CAL. CODE REGS. tit. 8, § 11160; CAL. LAB. CODE §§ 200, 500, 510, 1194, 1198; and (3) conversion, premised on the allegation that Kiewit wrongfully withheld its employees' regular wages and overtime compensation for its own use.

In its answer to the complaint, Kiewit asserted that Burnside's state law claims were preempted by section 301 of the LMRA. Two days after filing its answer, Kiewit removed the case to federal district court, stating as the basis for removal that the case arises under section 301 and is thus within the district court's federal question jurisdiction.

Once in federal court Kiewit moved for summary judgment. Before the district court could rule on that motion, Burnside filed a motion to remand the matter to state court for lack of jurisdiction. The district court ultimately denied that remand motion, concluding that his claims were indeed preempted by, and thus arose under, section 301 because they

"substantially depend" on an interpretation of the CBAs' terms and provisions. In a subsequent order, the district court granted Kiewit's motion for summary judgment, holding that Burnside's claims failed because he did not first exhaust his contractual grievance procedures or, in the alternative, because he did not file suit within the six-month statute of limitations period provided by the LMRA. *See* 29 U.S.C. § 160(b).

Burnside timely appealed.

## II

We review de novo the district court's holding that the state causes of action actually arise under section 301. *Cramer v. Consol. Freightways, Inc.*, 255 F.3d 683, 689 (9th Cir. 2001) (en banc). After doing so, we hold that Burnside's claims are not preempted by section 301 and may go forward under state law because (1) the right to be compensated for employer-mandated travel time is a right conferred by state law, independent of the CBAs; and (2) the matter at hand can be resolved without interpreting the CBAs. We explain each of our conclusions below, after first laying out the guiding principles regarding section 301 preemption.

## A

**[1]** The history and preemptive scope of section 301 of the LMRA has been well-chronicled both by the Supreme Court and by our own circuit. *See Livadas v. Bradshaw*, 512 U.S. 107, 121-24 (1994); *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 403-06 (1988); *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 208-13 (1985); *Cramer*, 255 F.3d at 689-93; *Balcorta v. Twentieth Century-Fox Film Corp.*, 208 F.3d 1102, 1106-09 (9th Cir. 2000). We rely on this extensive precedent to review the essentials.

Under section 301,

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). The Supreme Court decided early on that in enacting this statute, Congress charged federal courts with a "mandate . . . to fashion a body of federal common law to be used to address disputes arising out of labor contracts." *Lueck*, 471 U.S. at 209; *see also Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 104 (1962) (explaining that "in enacting [section] 301 Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules"); *Textile Workers Union v. Lincoln Mills of Ala.*, 353 U.S. 448, 456 (1957) (concluding that "the substantive law to apply in suits under [section] 301(a) is federal law, which the courts must fashion from the policy of our national labor laws"). As a result of this broad federal mandate, the Supreme Court has explained, the "preemptive force of section 301 is so powerful as to displace entirely any state cause of action for violation of contracts between an employer and a labor organization." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 23 (1983) (internal quotation marks omitted).

Once preempted, "any claim purportedly based on [a] . . . state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 393 (1987) (citing *Franchise Tax Bd.*, 463 U.S. at 24). This is true even in some instances in which the plaintiffs have not alleged a breach of contract in their complaint, if the plaintiffs' claim is either grounded in the provisions of the labor contract or requires interpretation of it. *See Lueck*, 471 U.S. at 210 ("If the policies that animate [section] 301 are to be given their proper range, . . . the pre-

emptive effect of [section] 301 must extend beyond suits alleging contract violations."). Otherwise, parties would be able "to evade the requirements of section 301 by relabeling their contract claims as claims for tortious breach of contract" or some other state cause of action, and thus "elevate form over substance." *Id.* at 211.

**[2]** To prevent such evasion, the *Lueck* line of section 301 preemption cases and its progeny require, first, an inquiry into whether the asserted cause of action involves a right conferred upon an employee by virtue of state law, not by a CBA. If the right exists solely as a result of the CBA, then the claim is preempted, and our analysis ends there. *See Lueck*, 471 U.S. at 212 (holding that section 301 cannot "preempt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract"); *Caterpillar*, 482 U.S. at 394 (explaining that section 301 only "governs claims founded directly on rights created by collective-bargaining agreements"). If, however, the right exists independently of the CBA, we must still consider whether it is nevertheless "substantially dependent on analysis of a collective-bargaining agreement." *See Caterpillar*, 482 U.S. at 394 (quoting *Int'l Bhd. of Elec. Workers v. Hechler*, 481 U.S. 851, 859 n.3 (1987)); *see also Lueck*, 471 U.S. at 213 (explaining that when "state . . . law purports to define the meaning of the contract relationship, that law is preempted"). If such dependence exists, then the claim is preempted by section 301; if not, then the claim can proceed under state law.

Tracing the line of "demarcation between preempted claims and those that survive [section] 301's reach" — is not a task that always "lends itself to analytical precision." *Cramer*, 255 F.3d at 691. We are aided in our quest, however, by useful guidelines developed by the Supreme Court.

First, to determine whether a particular right inheres in state law or, instead, is grounded in a CBA, the Court has instructed us to consider "the *legal* character of a claim, as

'independent' of rights under the collective-bargaining agreement [and] not whether a grievance arising from 'precisely the same set of facts' could be pursued." *Livadas*, 512 U.S. at 123 (emphasis added) (internal citations omitted) (quoting *Lueck*, 471 U.S. at 213, and *Lingle*, 486 U.S. at 410, respectively). The Court also has made clear that reliance on the CBA as an aspect of a defense is not enough to "inject[ ] a federal question into an action that asserts what is plainly a state-law claim." *See Caterpillar*, 482 U.S. at 398-99 (explaining that "the plaintiff is the master of the complaint," and that if the defendant could engineer "the forum in which the claim shall be litigated" based on the substance of his defense, "the plaintiff would be master of nothing"); *see also Cramer*, 255 F.3d at 691.

[3] Second, to determine whether a state law right is "substantially dependent" on the terms of a CBA, *see Caterpillar*, 482 U.S. at 394, the Court directs us to decide whether the claim can be resolved by "look[ing] to" versus interpreting the CBA, *see Livadas*, 512 U.S. at 125; *Cramer*, 255 F.3d at 691 (citing *Balcorta*, 208 F.3d at 1108-09). If the latter, the claim is preempted; if the former, it is not. Although the "look to"/"interpret" distinction is "not always clear or amenable to a bright-line test," *see Cramer*, 255 F.3d at 691, some assessments are easier to make than others. For example, we know that neither " 'look[ing]' to the CBA merely to discern that none of its terms is reasonably in dispute," *see id.* at 692 (alteration in original) (quoting *Livadas*, 512 U.S. at 125), nor "the simple need to refer to bargained-for wage rates in computing [a] penalty," *see Livadas*, 512 U.S. at 125, is enough to warrant preemption. *See also id.* at 124 (explaining that "when the meaning of contract terms is not the subject of dispute, the bare fact that a [CBA] will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished"). Similarly, "alleging a hypothetical connection between the claim and the terms of the CBA is not enough to preempt the claim." *Cramer*, 255 F.3d at 691. Finally, in cases presenting the question whether the plain-

tiff's union "bargained away the state law right at issue. . . . a court may look to the CBA to determine whether it contains a clear and unmistakable waiver of state law rights without triggering [section] 301 preemption." *Id.* at 692.

With these interpretive principles in place, we turn our attention to Burnside's claims against Kiewit.

**B**

Burnside argues, first, that the employees' right to be compensated for time spent in compulsory round-trip travel exists as a matter of state law and is independent of any provision found in the CBAs. We agree.

**1**

[4] The California Supreme Court has recognized an employee's state law right to be compensated for time spent traveling from a designated meeting point to the jobsite and from the jobsite back to the meeting point, when the employer requires this travel. *See Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 578 (2000) (applying a wage order that covers agricultural employees). Moreover, post-*Morillion*, the state's Industrial Welfare Commission ("IWC") adopted a regulation, known as California Industrial Commission Wage Order 16-2001, that applies this right to the employees in this appeal. *See* CAL. CODE REGS. tit. 8, § 11160. As a result, because the right to be compensated for employer-mandated travel exists as a matter of state law, independent of the CBAs, on this initial basis at least the employees' claims are not preempted.

The facts of *Morillion* are entirely reminiscent of the facts alleged in the instant complaint. Like Kiewit, the defendant in *Morillion*, Royal Packing Company, required its employees, who were agricultural workers, "to meet for work each day at specified parking lots or assembly areas" and "prohibited

[them] from using their own transportation to get to and from the fields." *Id.* at 579. From these "departure points," Royal Packing transported its employees, in buses that it provided and paid for, "to the fields where plaintiffs actually worked." *Id.* "At the end of each day," Royal Packing "transported plaintiffs back to the departure points on its buses." *Id.* Like the employees here, the employees in *Morillion* were never paid "for the time they spent (1) assembling at the departure points; (2) riding the bus to the fields; (3) waiting for the bus at the end of the day; and (4) riding the bus back to the departure points." *Id.* They sued for compensation for those time periods. *Id.*

The California Supreme Court found in the employees' favor. Its opinion was largely based on an interpretation of the relevant language in Wage Order 14-80, a regulation issued by IWC to cover agricultural employees.[6] *See* CAL. CODE REGS. tit. 8, § 11140. Wage Order 14-80 defines the term "[h]ours worked" as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." *Id.* § 11140(2)(G). Because the agricultural employees in *Morillion* were "required to spend [time] traveling on their employer's buses" to arrive at their daily jobsites, the state supreme court concluded that these employees had been "subject to the control of an employer" during those hours. 22 Cal. 4th at 578 (internal quotation marks omitted).[7]

---

[6]Operating under the auspices of the Department of Industrial Relations, the IWC is the state agency "authorized to formulate wage orders governing employment in California." *See Bearden v. U.S. Borax, Inc.*, 138 Cal. App. 4th 429, 433-34 (2006) (citing *Collins v. Overnite Transp. Co.*, 105 Cal. App. 4th 171, 174 (2003)); *see also* CAL. LABOR CODE §§ 1173, 1178.5, 1182, 1185. Although the state legislature defunded the IWC, effective July 1, 2004, the agency's wage orders remain in effect. *See Huntington Mem'l Hosp. v. Superior Court*, 131 Cal. App. 4th 893, 902 n.2 (2005). Courts treat IWC wage orders as "quasi-legislative regulations that are to be interpreted in the same manner as statutes." *Watkins v. Ameripride Servs.*, 375 F.3d 821, 825 (9th Cir. 2004).

[7]The *Morillion* court rejected Royal Packing's argument that traveling time did not constitute "hours worked" because employees were not tech-

In other words, the travel time qualified as "hours worked," and was therefore compensable under state law. *Id.* At the same time, *Morillion* made clear that "[t]ime employees spend traveling on transportation that an employer provides but does not require its employees to use may not be compensable as 'hours worked.' " *Id.* at 588; *see also Overton v. Walt Disney Co.*, 136 Cal. App. 4th 263, 265 (2006) (holding that no compensation was due employees for time spent traveling to work on an employer-provided shuttle bus, as the employees were not required to ride the shuttle bus but were free to use alternate means of transportation).

Unlike the agricultural employees in *Morillion*, the parties here are not covered under Wage Order 14-80. Instead, the applicable IWC regulation is Wage Order 16-2001, which covers employees in the construction, drilling, logging, and mining industries. *See* CAL. CODE REGS. tit. 8, § 11160.[8] Even though this appeal involves a different regulation than the one at issue in *Morillion*, at least two aspects of Wage Order 16-

---

nically "working" as they rode the bus, and instead were free to "read . . . or perform other personal activities." *Id.* at 586. In doing so, the court emphasized just how extensively Royal Packing's mandated travel time curtailed its employees' rights, explaining that "employees who commute to work on their own decide when to leave, which route to take to work, and which mode of transportation to use" and that "[b]y commuting on their own, employees may choose and may be able to run errands before work and to leave from work early for personal appointments." *Id.* at 586-87.

[8]Wage Order 16-2001 was adopted on October 23, 2000, but only became effective on January 1, 2001, after at least some of the plaintiffs in this putative class had been hired by Kiewit. *See Small v. Superior Court*, 148 Cal. App. 4th 222, 226 (2007). The complaint alleges, however, that the plaintiffs "were employed by [Kiewit] at various times spanning . . . [a] four year period." Complaint ¶ 14. Although Wage Order 16-2001, in all likelihood, did not cover every putative class member for the entirety of his tenure with Kiewit, the regulation was in effect during the majority of the time period at issue in this litigation, a point that neither party disputes.

2001 lead us to conclude that California state law confers on employees here the same right recognized in *Morillion*.

**[5]** First, Wage Order 16-2001 and Wage Order 14-80 use the same "hours worked" definition that the California Supreme Court so carefully parsed and relied upon in *Morillion*. *Compare* CAL. CODE REGS. tit. 8, § 11160 (2)(J), *with* CAL. CODE REGS. tit. 8, § 11140(2)(G) (both defining " '[h]ours worked' " as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so."). Second, and more importantly, Wage Order 16-2001 contains explicit language, not found in Wage Order 14-80, that extends the right to be compensated for compulsory travel time — as was articulated in *Morillion* with respect to agricultural employees — to construction industry employees:

In section (5)(A), under the heading "Reporting Time Pay," Wage Order 16-2001 provides that,

> All employer-mandated travel that occurs after the first location where the employee's presence is required by the employer *shall be compensated* at the employee's regular rate of pay or, if applicable, the premium rate that may be required by the provisions of Labor Code Section 510 and Section 3, Hours and Days of Work, above.

CAL. CODE REGS. tit. 8, § 11160 (5)(A) (emphasis added). Section (5)(D) then adds:

> Collective Bargaining Agreements. This section shall apply to any employees covered by a valid collective bargaining agreement *unless the collective bargaining agreement expressly provides otherwise*.

*Id.* § 11160 (5)(D) (emphasis added).

**[6]** Two aspects of section 5 are noteworthy for purposes of this case. First, section (5)(A) does not set the rate of compensation for reporting time. *Id.* § 11160 (5)(A). It explains only that employees can be paid either the "regular rate of pay or, if applicable," the overtime rate. *Id.* The overtime rate referred to by the regulation is provided for by both the state's Labor Code, *see* CAL. LAB. CODE § 510, and by a separate provision in Wage Order 16-2001, *see* CAL. CODE REGS. tit. 8, § 11160 (3). Second, section (5)(D) stresses that section (5)(A) automatically applies to employees already covered by a CBA, "*unless* [the CBA] expressly provides otherwise." *Id.* § 11160 (5)(D) (emphasis added). In other words, the operative presumption is that the right to be compensated for compulsory travel time, as articulated in *Morillion*, instantly attaches to all employees covered under Wage Order 16-2001, disappearing only if a governing CBA includes clear language to the contrary.[9]

Kiewit argues, however, that the IWC actually intended — contrary to the plain language of section (5)(D), as enacted —

---

[9]The history behind the regulation's enactment further evinces the IWC's intent to extend *Morillion* to employees covered by Wage Order 16-2001. The agency's "statement as to the basis" for the wage order, for example, explicitly cites to *Morillion* in its discussion of section (5)(A). *See* INDUSTRIAL WELFARE COMMISSION, STATEMENT AS TO THE BASIS FOR WAGE ORDER NO. 16 REGARDING CERTAIN ON-SITE OCCUPATIONS IN THE CONSTRUCTION, DRILLING, MINING, AND LOGGING INDUSTRIES, SECTION 5: REPORTING TIME PAY 10, http://www.dir.ca.gov/iwc/StatementAsToThe BasisWageorder16.pdf (last visited June 13, 2007) (hereinafter "STATE-MENT"). In addition, IWC members referred to *Morillion* at least once during a series of public hearings held in the fall of 2000 regarding Wage Order 16-2001. *See* Transcript of Record, State of California, Department of Industrial Relations, Industrial Welfare Commission, Public Hearing (Sept. 21, 2000), http://www.dir.ca.gov/iwc/PUBHRG9211.htm (where various IWC commissioners discuss the then-proposed order's "Reporting Time Pay" provision, explain that "the issue . . . is the definition of 'hours worked,' " and add that the "Supreme Court" has said that the definition of "hours worked" depends on "[w]hether the employer controls it or not").

for Section (5)(A) *not to apply* to employees covered by CBAs, unless the CBA expressly provided otherwise. To support its position, Kiewit points to some of the language found in IWC's "statement as to the basis" for Wage Order 16-2001.[10] According to the paraphrase of section (5)(D) found in the statement as to the basis, section (5)(D) "*does not apply* to any employee covered by a valid collective bargaining agreement unless the collective bargaining agreement expressly provides otherwise." *See* STATEMENT at 10 (emphasis added).

We have reviewed the relevant administrative record but have found nothing that explains the contradiction between the paraphrase of section (5)(D) that appears in the "statement as to the basis" and the version codified. Kiewit has no explanation either. The best we can surmise is to assume that the "statement as to the basis" incorrectly paraphrased the statutory language. Our conclusion that the final choice of language in section (5)(D) means what it says rather than the opposite of what it says is corroborated by the fact that another "opt-out" provision — i.e., a provision stating that a right "shall apply . . . unless the collective bargaining agreement provides otherwise" — as well as an "opt-in" provision — i.e., a provision stating that a right "shall not apply . . . if the agreement expressly provides" — both appear elsewhere in the wage order. *Compare* CAL. CODE REGS. tit. 8, § 11160 (3)(H)(2), *with id.* § 11160 (3)(H)(1); *see Stewart v. Ragland*, 934 F.2d 1033, 1041 (9th Cir. 1991) ("When certain statutory

---

[10]Under California state law, the IWC is required to " 'prepare a statement as to the basis upon which an adopted or amended order is predicated.' " *See Small*, 148 Cal. App. 4th at 232 (quoting CAL. LAB. CODE § 1177(b)). Although "[i]t 'need not be a totally exhaustive document,' " the statement as to the basis should "provide 'an explanation of how and why the [IWC] did what it did.' " *Id.* (second alteration in original) (quoting *Cal. Lab. Fed'n, AFL-CIO v. Indus. Welfare Comm'n*, 63 Cal. App. 4th 982, 997 (1998)); *see also Cal. Hotel & Motel Ass'n v. Indus. Welfare Comm'n*, 25 Cal. 3d 200, 213 (1979) (explaining that to facilitate judicial review of the agency's action, "[t]he statement should reflect the factual, legal, and policy foundations for the action taken").

provisions contain a requirement and others do not, we should assume that the legislature intended both the inclusion and the exclusion of the requirement.").

**[7]** In any event, it is the plain language of an actual, enacted regulation which must govern, not language that appears in the underlying rationale. *See Brewer v. Patel*, 20 Cal. App. 4th 1017, 1021 (1993) (explaining that "[w]hen . . . language [of a regulation] is clear, we must apply that language without indulging in interpretation") (citing *Delaney v. Superior Court*, 50 Cal. 3d 785, 800 (1990)); *see also Manriquez v. Gourley*, 105 Cal. App. 4th 1227, 1235 (2003) (writing that a court "may look" to "extrinsic aids," including "the purpose of the regulation, the legislative history, public policy, and the regulatory scheme of which the regulation is a part," to help it interpret a regulation "[w]hen the agency's intent cannot be discerned directly from the language of the regulation"). We therefore proceed with that understanding of section (5)(D) — i.e., that employers and employees may opt out of the state-law right through provisions in CBAs, but need not affirmatively opt in.

### 2

Kiewit argues that the presence of an "opt-out" provision in section (5)(D) of Wage Order 16-2001 militates against concluding that the right to be compensated for employer-mandated travel time is a right conferred as a matter of state law that exists independently of the CBAs. The very fact that the right can be bargained away, Kiewit contends, suggests it does not exist independently of the CBA, and leads inevitably to the conclusion that Burnside's claims are preempted.

**[8]** We must disagree. Initially, as a matter of pure logic, a right that inheres *unless* it is waived exists independently of the document that would include the waiver, were there a waiver. The right arises from state law, not from the CBA, and is vested in the employees directly, not through the

medium of the CBA. And if the CBA says nothing at all about pay for travel time, the right to be paid for that time still exists. The right is therefore one that came into existence entirely independently of the CBA, and that remains in existence, independently of the CBA, *unless* a condition subsequent — waiver by the CBA — occurs.

**[9]** Moreover, neither the Supreme Court nor, as far as we can determine, any other court, has ever held that the *potential* for waiver absent actual waiver is enough — standing alone — to trigger preemption under section 301. And for good reason. To adopt the contrary position, as Kiewit asks us to, would be to effectively penalize unionized employees simply because they have the option of waiving a state-law-conferred right through collective bargaining, presumably in exchange for some other benefit. Nothing in the Court's jurisprudence, as we illustrate below, suggests that the section 301 preemption doctrine requires this result.[11]

We begin with *Lueck* and its statement that "state-law rights and obligations that do not exist independently of private agreements, *and that as a result can be waived or altered by agreement of private parties*, are pre-empted by those agreements." 471 U.S. at 213 (emphasis added). Read in isolation, this sentence — more precisely, its highlighted portion — might be understood to suggest that for a state-law right to be entirely independent of a private agreement, it cannot be subject to any bargaining or negotiation. On this interpretation, independence and nonwaivability are simply two sides of the same coin. For two reasons, however, we do not accept this reading of *Lueck* as supporting Kiewit's position that the inchoate possibility of opting out of coverage of a state law through a CBA means automatic section 301 preemption, whether or not the CBA actually contains any such waiver:

---

[11]Our decision today reaches only opt-out, not opt-in, statutes. The latter present a somewhat different problem. Under the opt-in approach, the state-law rights can be more readily viewed as existing only if the CBA says so and as therefore dependent on the CBAs.

(1) First, if read as we have posited, the above cited language from *Lueck* would be patent dicta. After all, *Lueck*'s focus was solely on whether the particular right in question — a state tort action for the bad-faith handling of an insurance claim — was so derivative of the terms of the CBA that it would not exist independently of the agreement, and was thus subject to section 301 preemption. In *Lueck*, the only reason the plaintiff had an insurance claim at all was because the CBA created an obligation on the part of the employer to provide the insurance benefit in question. *See id.* at 217 ("The duties imposed and rights established through the state tort thus derive from the rights and obligations established by the contract."); *id.* at 218 ("Because the right asserted not only derives from the contract, but is defined by the contractual obligation of good faith, any attempt to assess liability here inevitably will involve contract interpretation."). The *Lueck* Court therefore had no need to consider whether a state-law right that is not derivative of or dependent on a CBA is nonetheless preempted for unionized employees if that right potentially *could* be — but was not — waived in the CBA. *See Kastigar v. United States*, 406 U.S. 441, 454-55 (1972) (explaining that "broad language . . . unnecessary to the Court's decision . . . cannot be considered binding authority").[12]

---

[12]For the same reason, other language in *Lueck* is dicta as well, if applied to rights not created in the first instance by the CBA. In particular, *Lueck* states that a court's preemption analysis "must focus . . . on whether the [state cause of action] . . . confers *nonnegotiable* state-law rights on employers or employees independent of any right established by contract, or, instead, whether evaluation of the . . . claim is inextricably intertwined with consideration of the terms of the labor contract." 471 at 213 (emphasis added). The term "nonnegotiable" is repeated in one other instance in *Lueck*, *see id.* at 217 n.11 ("We pass no judgment on whether an independent, nonnegotiable, state-imposed duty which does not create similar problems of contract interpretation would be pre-empted under similar circumstances."), as well as once in *Livadas*, *see* 512 U.S. at 123 (writing that "[section] 301 cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law"). In each of these instances, the use of the word "nonnegotiable" — as a defin-

(2) Second, the cited language from *Lueck* need not be, and in our view should not be, interpreted as we have initially posited — i.e., as a statement that if a right can be waived, then it is not independent. The more plausible reading is one that conforms with the situation faced by the Court in *Lueck*: that *if* a right exists only because of the CBA and, "*as a result*" of that dependence "can be waived or altered by agreement of the parties," *see Lueck*, 471 U.S. at 213 (emphasis added), then there is preemption. This interpretation makes far more sense given the context of *Lueck*, which, as we have explained, was concerned with a benefit that existed solely as a result of the CBA.

This second, alternative interpretation of the language from *Lueck* — and the one we adopt — is corroborated by the Supreme Court's post-*Lueck* cases, none of which assert the proposition that waivability means non-independence if the source of the right in question is indubitably state law and not the CBA. To be sure, and as we have noted, the Court has never squarely addressed the role that opt-out provisions such as the one in this case must play in section 301 preemption analysis. In *Lingle*, however, the Court had occasion again to define the term " 'independent' . . . for [section] 301 preemption purposes," and did so by explaining that a "state-law remedy . . . is 'independent' of the collective-bargaining agreement" if "resolution of the state-law claim does not require construing the collective-bargaining agreement." 486 U.S. at 407. *Lingle*, in other words, made no mention of non-waivability or nonnegotiability as defining features of an "independent" state-law right. *See also Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 262 (1994) (characterizing the

_____

ing aspect of an "independent" state-law right — would be dicta if read as Kiewit would have us do, to describe a state law containing a one-way opt-out provision, like the state law at issue here. (For that matter, it would be dicta even in the context of a one-way opt-in provision, as neither *Lueck* nor *Livadas* concerned such a provision.)

Court's ruling in *Lingle* as one in which "the LMRA pre-empts state law *only if* a state-law claim is dependent on the interpretation of a CBA" (emphasis added)).

Moreover, as *Lingle* goes on to emphasize, even in instances in which the state has granted workers a "nonnego-tiable" right, the fact of nonnegotiability alone is not a talis-man for determining preemption. Instead, *Lingle* explained, "[w]hile it may be true that most state laws that are not pre-empted by [section] 301 will grant nonnegotiable rights that are shared by all state workers, . . . neither condition ensures nonpre-emption," nor is the contrary the case. 486 U.S. at 407 n.7. "[A] law could cover only unionized workers," the *Lingle* Court went on, "but remain unpre-empted if no collective-bargaining agreement interpretation was needed to resolve claims brought thereunder." *Id.* Thus, in a situation like the one presented here — where section (5)(D)'s opt-out provi-sion applies only to unionized workers — preemption would follow only if the CBA had to be interpreted to resolve Burn-side's claims. We address the question of interpretation in a subsequent section.[13] For present purposes, though, *Lingle* supports the proposition that the mere presence of an opt-out provision in a state law — a provision which, by definition, pertains only to unionized workers — cannot be enough to trigger preemption.[14]

---

[13]In particular, we respond to Kiewit's contention that because a court would have to review the CBA to see whether the employees did choose to waive their state-law right, that review would constitute an "interpreta-tion" of, rather than a "looking to," the CBAs. *See infra* p. 7311.

[14]There are cases in our circuit and in California that have held the par-ticular rights at issue to be conferred as a matter of state law, and indepen-dent of the CBAs, in large part because the state legislature had been explicit about their inherent non-waivability. *See Valles v. Ivy Hill Corp.*, 410 F.3d 1071, 1077-80 (9th Cir. 2005) (surveying the relevant statutory provisions and legislative history before concluding that the state legisla-ture intended that "the substantive provisions mandating meal periods . . . could not 'in any way be contravened or set aside by a private agreement, whether written, oral, or implied' " (quoting CAL. LABOR CODE §§ 219,

Our reading of *Lueck* is also corroborated by *Livadas*'s discussion of waiver during the collective bargaining process. *Livadas* involved a claim brought under section 203 of the California Labor Code, which renders an employer liable if he fails to pay an employee all wages owed her immediately upon her discharge. 512 U.S. at 111. The Court concluded that the employee's claim was not preempted, because "[t]he only issue raised . . . was a question of state law, entirely independent of any understanding embodied in the collective-bargaining agreement," and because the fact that the agreement might eventually be " 'look[ed] to' . . . for damages computation is no reason to hold the state-law claim defeated by [section] 301." *Id.* at 124-25. In addition, *Livadas* went on, preemption was not warranted because "[t]here is no suggestion here that Livadas's union sought or purported to bargain away her protections under [state law], a waiver that we have said would . . . have to be 'clear and unmistakable,' for a court even to consider whether it could be given effect." *Id.* (quoting *Lingle*, 486 U.S. at 409 n.9 (internal quotation marks omitted)). Of course, if the very fact that a right *could be waived* were enough to warrant preemption then, logically speaking, just how "clear or unmistakable" the waiver actu-

226.7)); *Balcorta*, 208 F.3d at 1111 (holding that "[t]he rights granted to employees by California Labor Code § 201.5 are not subject to negotiation," given the legislative history surrounding the statute); *Zavala v. Scott Bros. Dairy, Inc.*, 143 Cal. App. 4th 585, 596 (2006) (holding that rights related to "rest periods and wage-stub itemization" were nonwaivable and nonnegotiable, noting that state legislators had specified that these rights constituted "minimum substantive guarantees" and that, through section 219 of the Labor Code, "the Legislature has categorically forbidden the modification of any provision of these laws" (internal quotation marks omitted)). Nothing in these cases, however, states the opposite proposition — that a state law-conferred right is necessarily preempted if it is waivable in a CBA under state law. And to read these cases as implicitly adopting that proposition would be to suppose that they contradict the Supreme Court's explicit *Lingle* assertion that "nonnegotiability" is *not* talismanic, in either direction, with regard to section 301 preemption, a supposition in which we cannot indulge. *See Lingle*, 486 U.S. at 407 n.7.

ally turned out to be should have no impact on a court's pre-emption analysis. That the nature of the actual, consummated waiver does matter, however, supports our conclusion that the possibility of waiver, by itself, is not enough to make an otherwise independent state-law right contingent on the terms of a CBA in the sense necessary to trigger preemption under section 301.

**3**

Our conclusion that the *possibility* of waiver does not automatically trigger preemption makes sense not only as a rational derivation of the pertinent portions of *Lueck*, *Lingle*, and *Livadas*, but also as it relates to the Supreme Court's more general jurisprudence concerning the collective bargaining process and the protections accorded unionized workers. Section 301 preemption focuses on the impact of state law on the enforcement of the end-product of that process, the CBAs negotiated between unions and employers. More broadly, the interplay of collective bargaining, state labor law, and the rights of both employers and employees also features in cases involving the National Labor Relations Act, 29 U.S.C. §§ 157-158 ("NLRA"), which is "concerned primarily with establishing an equitable process for determining terms and conditions of employment," *see Metro. Life Ins. Co. v. Mass.*, 471 U.S. 724, 753 (1985), and the corresponding *Machinists* preemption doctrine, *see Lodge 76, Int'l Ass'n of Machinists v. Wis. Employment Relations Comm'n*, 427 U.S. 132. 140-41 (1976). Under that doctrine, state activity may be restricted "on the theory that pre-emption is necessary to further Congress['s] intent that 'the conduct involved be unregulated because [it should be] left to be controlled by the free play of economic forces.' " *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 19-20 (1987) (second alteration in original) (internal quotation marks omitted) (quoting *Machinists,* 427 U.S. at 140).

In the *Machinists* line of cases, the Court has repeatedly repudiated the idea that the mere ability of unionized workers

to bargain collectively somehow makes it permissible to give unionized employees fewer minimum labor-standards protections under state law than other employees. *See, e.g.*, *Fort Halifax Packing*, 482 U.S. at 21 (explaining that "pre-emption should not be lightly inferred . . . , since the establishment of labor standards falls within the traditional police power of the State"); *id.* at 21-22 ("[T]he mere fact that a state statute pertains to matters over which the parties are free to bargain cannot support a claim of pre-emption, for 'there is nothing in the NLRA . . . which expressly forecloses all state regulatory power with respect to those issues . . . that may be the subject of collective bargaining.' " (alteration in original) (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504-05 (1978))); *Metro. Life Ins.*, 471 U.S. at 755-56 (rejecting the argument that the state's establishment of minimum substantive labor standards undercut the collective bargaining process and thus should be preempted by the NLRA, and adding that "[i]t would turn the policy that animated the Wagner Act on its head to understand it to have penalized workers who have chosen to join a union by preventing them from benefitting from state labor regulations imposing minimal standards on nonunion employers"). *Livadas*, in turn, heavily relied on this logic in holding California policy differentiating between union and nonunion employees "irreconcilable" with the NLRA. *See* 512 U.S. at 132. In doing so, it articulated a nondiscrimination rationale relevant to the instant appeal.

As explained earlier, *Livadas* involved an employee's claim against her employer after the employer failed to pay all wages owed her immediately upon discharge, as required by the state's labor code. *Id.* at 111. California's Labor Commissioner refused to take action against the employer, citing its policy of not enforcing the state's severance pay provisions when the employee involved in the dispute is covered by a CBA that contains an arbitration clause. *Id.* at 112-13. Before the Supreme Court, the Commissioner sought to defend this "hands off" policy by arguing that "official restraint will actually encourage the collective-bargaining and arbitral processes

favored by federal law." *Id.* at 126; *see also id.* at 128. To bolster this defense, the Commissioner pointed to "a number of state and federal laws that draw distinctions between union and nonunion represented employees," presumably as evidence that other states give employees the option of "forfeit[-ing]" certain state-law rights upon entering a CBA. *Id.* at 131-32 (citing, as examples of the such statutes, "D.C. CODE ANN. § 36-103 (1993) ('Unless otherwise specified in a collective agreement . . . [w]henever an employer discharges an employee, the employer shall pay the employee's wages earned not later than the working day following such discharge'); 29 U.S.C. § 203(*o*) ('Hours [w]orked' for Fair Labor Standards Act measured according to 'express terms of . . . or practice under bona fide collective-bargaining agreement')" (alterations in original)).

The *Livadas* Court rejected the argument that a state's "hands off" policy advances federal labor policy with regard to unionized employees, explaining — in language largely borrowed from the *Machinists* line of case law — that the Commissioner's "assertion that represented employees are less 'in need' precisely because they have exercised federal rights poses special dangers that advantages conferred by federal law will be canceled out and its objectives undermined." *Id.* at 129 (citing *Metro. Life Ins.*, 471 U.S. at 756); *see also id.* at 130 ("[W]e have never suggested that labor law's bias toward bargaining is to be served by forcing employees or employers to bargain for what they would otherwise be entitled to as a matter of course." (citing *Metro. Life Ins.*, 471 U.S. at 757)); *id.* at 131 (explaining that in *Fort Halifax Packing*, "the minimum protections" of the state's labor law "were relinquished not by the mere act of signing an employment contract (or collective-bargaining agreement), but only by the parties' express agreement on different terms" (citing *Fort Halifax Packing*, 482 U.S. at 21)).

*Livadas* also explained that although the Commissioner correctly pointed out that it is not atypical for state laws to

distinguish between union and nonunion employees by enacting statutes with "opt-out" provisions, "virtually all" of those statutes[15] still afforded "union-represented employees . . . the full protection of the minimum [state] standard, *absent any agreement for something different*." *Id.* (emphasis added). "These 'opt out' statutes," the Court continued, "are thus manifestly different in their operation (and their effect on federal rights) from the Commissioner's rule that an employee forfeits his state-law rights the moment a collective-bargaining agreement with an arbitration clause is entered into." *Id.* at 131-32. In so stating, the Court clarified the continuing validity, not invalidity, of such statutes. *Id.* at 132 ("[O]ur holding that the Commissioner's unusual policy is irreconcilable with the structure and purposes of the Act should cast no shadow on the validity of these familiar and narrowly drawn opt-out provisions."). Yet, under Kiewit's theory, these statutes would *not* in practice afford union-represented employees full protection absent waiver. Instead, combined with the section 301 preemption doctrine, they would disadvantage unionized workers just for being unionized workers, by "forcing [unionized] employees . . . to bargain for what they otherwise would be entitled to as a matter of course." *Id.* at 130. To so understand the impact of section 301 preemption is to run squarely into the Supreme Court's assertion in *Livadas* that opt-out provisions are generally consistent with federal labor policy.

[10] Read together, then, *Metropolitan Life Insurance*, *Fort Halifax Packing*, and *Livadas* crystallize the Supreme Court's view that a unionized employee cannot be deprived of the full protections afforded by state law simply by virtue of the fact that her union has entered into a CBA. Although her union may certainly bargain "for something different" or reach "ex-

---

[15]*Livadas* never explains this caveat. Because the language used in section (5)(D) of Wage Order 16-2001 is very similar to the language used in the opt-out provisions cited in *Livadas*, though, the caveat is irrelevant for present purposes.

press agreement on different terms," *see Livadas*, 512 U.S. at 131, the fact remains that "if impasse is reached" during those negotiations, then the "pre-existing state law" remains intact, *see Fort Halifax Packing*, 482 U.S. at 21. The state-law-conferred right, in other words, remains with the employee unless and until it is expressly given away. To hold otherwise would impermissibly disadvantage the unionized employee, because a failure to negotiate the right nevertheless will result in its forfeiture.

In the specific context of this appeal, this would mean that Burnside instantly would have waived his state-law-conferred right to be compensated for compulsory travel time — thus triggering section 301 preemption — the moment he became part of a bargaining unit covered by a CBA, regardless of whether his union ever sought to trade that right for some other benefit during the collective bargaining process. The result would be that simply because he worked at a unionized workplace, Burnside would have *neither* the right to travel time *nor* any benefit obtained in exchange for it. This conclusion could not be reconciled with *Livadas*'s disapproval of approaches to labor preemption doctrine that disadvantage unionized employees simply for being covered by a CBA, regardless of its terms. *See* 512 U.S. at 129 (explaining that "the widespread practice in Congress and in state legislatures" has always been that "basic employment guarantees and protections" should be bestowed "on individual employees without singling out members of labors unions (or those represented by them) for disability").

**[11]** We should not interpret the doctrine of section 301 preemption so broadly as to undermine the broader precepts of federal labor policy of which enforcement of CBAs is a part. After all, the Supreme Court has termed section 301 preemption but an "acorn," not a "mighty oak." *Id.* at 122. We therefore hold that the mere presence of an opt-out provision in section (5)(D) of Wage Order 16-2001 does not automatically sever the employees' connection to their state-law

rights, as articulated in section (5)(A) of the same wage order and in *Morillion*.

\* \* \* \* \*

**[12]** In conclusion, we hold that Burnside's claims that Kiewit must compensate the employees for time spent traveling from designated meeting points to their jobsites and back, as Kiewit required, are based on a right conferred as a matter of state law — in particular, *Morillion* and Wage Order 16-2001[16] — not by the CBAs. That Wage Order 16-2001 contains an opt-out provision does not change our analysis. Burnside's claims are thus not preempted by section 301 on the ground that they assert a state cause of action dependent on rights created by the CBAs.

## C

This conclusion does not end our inquiry. We must now separately consider whether Burnside's claims are nevertheless preempted by section 301 because they "substantially

---

[16]We note that we found no other statute in the state's Labor Code that addresses commuting or traveling time in a manner relevant to this appeal, nor did either party alert us to any. The district court erred by suggesting otherwise, when discussing section 510(b) of the California Labor Code in the order denying the employees' motion to remand. Under section 510(b),

> *Time spent commuting to and from the first place at which an employee's presence is required by the employer* shall not be considered to be a part of a day's work, when the employee commutes in a vehicle that is owned, leased, or subsidized by the employer and is used for the purpose of ridesharing, as defined in Section 522 of the Vehicle Code.

CAL. LABOR CODE § 510(b) (emphasis added). The language of the statute is clear that this provision pertains only to an employee's commute from a location, such as her home, to the first location her employer requires her presence (and back), not any commute she would undertake after arriving at that first location.

depend[ ] on" an interpretation of the terms of the CBAs. *See Caterpillar*, 482 U.S. at 394. After examining the relevant CBA provisions, we conclude that the claims can be resolved by — at most — merely "looking to" the CBAs and that the claims, therefore, are not preempted by section 301.

**1**

We begin by reviewing the relevant text of each CBA regarding the employees' right to be compensated for time spent commuting. Agreements 1, 4, and 5 include substantially similar versions of the following provision, which we take from Agreement 1:

> **[13]** The Contractor shall be responsible for payment of wages from the reporting point (parking area), as ordered by the Contractor to the jobsite and from job-to-job and return. However, employees who voluntarily report to a point for free transportation to the jobsite will not be compensated for the time in route and return.

So these three CBAs address the issue of compensation for travel time between a "reporting point" and "jobsite," and distinguish between employer-mandated travel and voluntary travel. Agreements 2 and 3, on the other hand, do neither. Instead, they state only the following:

> Employees shall travel to and from work on their own time and by means of their own transportation.

Despite these differences in wording, none of the CBAs require an "interpretation" of their provisions to determine whether Kiewit owed its employees compensation for compulsory travel time. Examining any of them would only confirm that none contain an express waiver, as contemplated by section (5)(D) of Wage Order 16-2001, of the right codified in section (5)(A). The need to conduct such a cursory exami-

nation does not "trigger[ ] [section] 301 preemption," as "a court may *look to*" — not interpret — "the CBA[s] to determine whether [they] contain[ ] a clear and unmistakable waiver of state law rights." *See Cramer*, 255 F.3d at 692 (emphasis added).

**[14]** Nor is there any other provision in any of the agreements that would need to be interpreted to decide Burnside's claim. By specifying that "[t]he Contractor shall be responsible for payment of wages from the reporting point . . . to the jobsite and from job-to-job and return," Agreements 1, 4, and 5, at best, merely confirm that they confer upon employees the same right already conferred upon them by state law. As the Court explained in *Lingle*, "[T]he mere fact that a broad contractual protection . . . may provide a remedy for conduct that coincidentally violates state-law does not make the existence or the contours of the state law violation dependent upon the terms of the private contract." *See* 486 U.S. at 412-13. Agreements 2 and 3 provide even less — in fact, no — fodder for interpretation, as they do not even broach the subject of compensation for compulsory travel time.

Kiewit argues to the contrary, contending that an "interpretation" of the CBAs' "work rules" are needed before employees' claims could be resolved. In so arguing, Kiewit relies on *Morillion*, which discussed Royal Packing's "work rules" when determining whether the employees there were, in fact, required to travel to their job sites from a designated meeting point. *See* 22 Cal. 4th at 579 & n.1. There is no indication in *Morillion*, however, that the California Supreme Court ascertained those "work rules" based on an interpretation of an employer-employee contract. In fact, there is no indication from *Morillion* that the agricultural employees concerned were even covered by a CBA.

Even assuming that the *Morillion* court deciphered the relevant rules from a CBA, the "work rules" that Kiewit points to here are wholly irrelevant to the central issue in this appeal.

In its briefs, for example, Kiewit points to the fact that "the CBAs each contain provisions stating that the employer will provide free or employer-paid parking at the worksites unless parking areas were remote or hazardous," and thus argues that "[t]he terms 'remote' and 'hazardous' are subject to conflicting interpretations, such that there may be a dispute whether employees had a right under the CBA to parking at a given worksite." Whether Kiewit had an obligation to provide employees with parking near the jobsite, however, does not bear on whether Kiewit in fact required its employees to commute to the jobsite from a designated meeting point.

Kiewit also argues that some of "the CBAs provide that employees will not be paid when they voluntarily chose to ride the van to work," and that "the term 'voluntarily' is subject to conflicting interpretation[s]." But Wage Order 16-2001 requires payment for travel time only when the employer *mandates* use of its transportation. The CBA provisions thus do not change the state-created rule, and, as far as we can tell, will not need to be consulted to implement it. Nor does Kiewit suggest any specific interpretation of the term "voluntarily" that would affect the application of Wage Order 16-2001 to the circumstances of this case. Our circuit has repeatedly frowned upon defendants who have invoked tangentially related CBA provisions in a strained and transparent effort to extinguish state-law claims via preemption. *See, e.g.*, *Cramer*, 255 F.3d at 694 ("Consolidated cannot create a dispute as to the meaning of the terms of the CBA by picking out terms that refer to videotapes and drug use, particularly when a cursory examination of those provisions makes clear they apply to a completely different context and set of circumstances."); *Ward v. Circus Circus Casinos, Inc.*, 473 F.3d 994, 999 (9th Cir. 2007) (rejecting defendant Circus's contention that "its right to direct and control its employees pursuant to the CBA requires interpretation," and writing that "[t]he connection between Circus controlling its employees and using any amount of physical force against them is even more attenu-

ated than the connection held to be insufficient in . . . *Cramer*"). We refuse to break from that tradition today.

**[15]** Certainly, some amount of fact-finding will have to be done in this case to determine whether Kiewit actually required its employees to travel on Kiewit-owned and -operated vehicles from a designated meeting point to the jobsite and back. The need for a "purely factual inquiry . . . [that] does not turn on the meaning of any provision of a collective-bargaining agreement," however, is not cause for preemption under section 301. *See Lingle*, 486 U.S. at 407. In *Lingle*, the plaintiff-employee was covered by a CBA that afforded her "a contractual remedy for discharge"; she sought instead to "enforce her state-law remedy for retaliatory discharge." *Id.* at 401. While under both the contractual and state-law causes of action the employer would have had to show that "it had a nonretaliatory reason for the discharge," the Court disagreed with the position that "such parallelism renders the state-law analysis dependent upon the contractual analysis" and found the employee's claim not preempted. *Id.* at 407-08, 413. As in *Lingle*, Kiewit cannot maintain that its employees' claims are preempted merely because a state court eventually will have to determine whether the travel was compulsory, even if a court would have had to undertake the same inquiry to enforce rights contained in Agreements 1, 4, and 5.[17]

## 2

Finally, Kiewit argues that this dispute is really one over overtime wages, not compensation for compulsory travel time. As a result, it contends, Burnside's claims are preempted by section 301 under our decision in *Firestone v. Southern California Gas Co.*, 219 F.3d 1063 (9th Cir. 2000).

---

[17]Agreements 2 and 3 do not present even the possibility of a parallel factual inquiry, as those CBAs do not afford the right to compensable, compulsory travel time.

In *Firestone*, the dispute between the parties was over the *rate* paid for overtime work — specifically, whether the employer had "fail[ed] to provide a 'premium' wage rate for overtime work," as required by state law. *Id.* at 1066. We held that determining whether an employee was receiving a "premium wage rate" for overtime under a CBA, such that the employer would be exempt from section 510 of the California Labor Code,[18] was a dispute that could not be resolved without interpretation of the agreement. *Id.* As a result, we found the employees' claims preempted by section 301. *Id.*

Burnside, in turn, relies on *Gregory v. SCIE, LLC*, 317 F.3d 1050, 1053 (9th Cir. 2003), to support his contention that preemption is not warranted when there is no dispute over the "*method*" of calculating overtime, simply the "*result*" of such calculations. In *Gregory*, the employee claimed that his employer failed to pay him "premium wage rates" for all "hours worked in excess of eight hours in one workday and forty hours in one workweek," in accordance with section 510 of the California Labor Code. *Id.* at 1051-52.

[16] The answer to this debate, however, resides in neither *Firestone* nor *Gregory*; rather, it is directly provided by *Livadas*. There, the employee never disputed how much her employer owed her; she merely disputed the fact that her

---

[18]Section 510 codifies when overtime must be paid and what the overtime rate will be. *See* CAL. LAB. CODE § 510. Under section 514 of the state's labor code, section 510

> do[es] not apply to an employee covered by a valid collective bargaining agreement if the agreement expressly provides for the wages, hours of work, and working conditions of the employees, and if the agreement provides premium wage rates for all overtime hours worked and a regular hourly rate of pay for those employees of not less than 30 percent more than the state minimum wage.

CAL. LABOR CODE § 514. Substantially similar versions of sections 510 and 514 also appear in Wage Order 16-2001. *See* CAL. CODE REGS. tit. 8, § 11160 at (3).

employer failed to pay her immediately upon discharge. *See* 512 U.S. at 125 ("There is no indication that there was a 'dispute' in this case over the amount of the penalty to which Livadas would be entitled."). Still, in *Livadas*, a court eventually would "need to 'look to' the collective-bargaining agreement for damages computation," as the statutory penalty depended on the employee's wage rate, *see* 512 U.S. at 125, and the wage rate was set by the CBA. So recognizing, *Livadas* held that "the mere need to 'look to' the collective-bargaining agreement for damages computation is not reason to hold the state-law claim defeated by section 301. *Id.* (citing *Lingle*, 486 U.S. at 413 n.12).

[17] Like *Livadas*, Burnside is not — as in *Firestone* — complaining about the wage rate the employees were paid for certain work, but about the fact that he was not paid at all. The CBAs all contain provisions governing the regular rate and the rate of overtime wages. As in *Livadas*, there is no indication in this case of any dispute concerning which wage rate would apply to any or all hours of transportation time, *if* those hours are compensable. The basic legal issue presented by this case, therefore, can be decided without interpreting the CBA. Depending on how that issue is resolved, damages *may* have to be calculated, and in the course of that calculation, reference to — but not interpretation of — the CBAs, to determine the appropriate wage rate, would likely be required.[19]

---

[19]It is of course possible — just as it was in *Livadas* — that some dispute we cannot now foresee will arise in the course of computing damages that will require the interpretation of the CBAs. If that contingency eventuates, the district court will be able to devise processes to preserve the preeminent role of the CBAs' dispute resolution processes to address the discrete dispute then arising. *See Livadas*, 512 U.S. at 124 n.18 (noting that "[h]olding the plaintiff's cause of action substantively extinguished may not . . . always be the only means of vindicating the arbitrator's primacy as the bargained-for contract interpreter"); *see also Cramer*, 255 F.3d at 691. The alternative Kiewit suggests — preempting the entire cause of action now, even though the likelihood is that no dispute requiring interpretation of the CBAs will ever arise — would turn section 301 preemption doctrine — into the "mighty oak" we know it is not. *See Livadas*, 512 U.S. at 122.

Under *Livadas*, this need to consult the CBAs to determine the wage rate to be used in calculating liability cannot, alone, trigger section 301 preemption.

[18] In short, Burnside's central claim — that Kiewit must compensate the employees for time they spent traveling as required by Kiewit — does not require an "interpretation" of the CBAs. That claim is therefore not preempted by section 301. That is all that matters for present purposes.

### III

[19] In conclusion, Burnside's claims are not preempted by section 301 because the right to be compensated for compulsory travel time is a right conferred as a matter of state law that exists independent of the terms of the CBAs, and because the claims to compensation for that time can be resolved without interpreting these agreements. The district court erred in concluding otherwise. We therefore vacate the district court's orders denying employees' motion to remand and granting defendant's motion for summary judgment, and remand with instructions for the district court to remand the matter to the Superior Court of San Diego County.

**VACATED AND REMANDED.**